IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHRISTOPHER KELSON, | § | |
| DAKOTA KELSON, RYLIE KIMBRELL, | § | |
| AND ESTATE OF | § | |
| HIRSCHELL FLETCHER, JR., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 3:18-CV-03308-E |
| | § | |
| CITY OF DALLAS, | § | |
| a Municipal Corporation, | § | |
| OFFICER GEORGE MORALES, | § | |
| OFFICER CHRISTOPHER TODD, | § | |
| OFFICER NICHOLAS MORRIS, | § | |
| OFFICER JAMES HERNANDEZ, and | § | |
| DSO WARREN, each in their | § | |
| individual capacities | § | |
| | § | |
| Defendants. | § | |

## **ORDER AND MEMORANDUM OPINION**

Plaintiffs Christopher Kelson, Dakota Kelson, Rylie Kimbrell, and the Estate of Hirschell

Fletcher, Junior (referred as "Kelson") filed this suit against Defendants City of Dallas (the "City")

and Officers George Morales, Christopher Todd, Nicholas Morris (referred as "DPD Officers"),

and James Hernandez and DSO Warren (referred as "CDC Officers") in their individual capacities

(all collectively "Defendants") under 42 U.S.C. § 1983. Specifically, Kelson asserts claims for (1)

false arrest, (2) denial of medical treatment, (3) failure to treat, (4) *Monell*[1] policy and custom, and

(5) wrongful death. On August 4, 2020, Defendants filed a Motion for Summary Judgment, (ECF

No. 111), seeking dismissal of all claims against them under the doctrine of qualified immunity.[2]

---

[1] *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978).
[2] Kelson's failure to treat claim is against the DFR Paramedics, who are not parties to this Motion, and thus, the
Motion is not seeking dismissal of this claim.

Having carefully considered the parties' briefing; appendices; and the applicable law, for reasons that follow, the Court hereby **GRANTS** the Defendants Motion, thereby dismissing all of Plaintiff's claims against Defendants.

## I.   BACKGROUND

This case arises out of the arrest of Hirschell Fletcher, Junior ("Fletcher") in the early evening hours of December 30, 2016. At approximately 5:30 p.m. on December 30, 2016, Fletcher was assaulted twice outside the Stewpot—a daytime shelter for the homeless in Dallas, Texas. (ECF No. 34 at 5-6). Both of these assaults and the events leading up to the assaults were captured on the Stewpot's external surveillance cameras. (ECF No. 114, Exs. 1-A, 1-B).  After the first assault, Fletcher fled the scene but returned shortly thereafter where he was then assaulted again. (ECF No. 34 at 6). During this second assault, Fletcher was punched in the head, causing him to fall and hit his head. (ECF No. 34 at 6). He fell to the sidewalk where he lay motionless for close to an hour without receiving help from anyone. (ECF No. 114, Exs. 1-B at 2:20-39:30, 1-C at 2:30-52:30).

DPD Officer George Morales ("Morales") was driving a marked police car on routine patrol at approximately 7:40 that evening. (ECF No. 111 at 3). As he drove by the Stewpot shortly after the second assault on Fletcher, a bystander flagged him down. (ECF No. 34 at 6). Morales approached Fletcher, and as alleged, he noticed a wound on Fletcher's head and that Fletcher's pants were covered in feces from the waist down. (ECF No. 111 at 4). After speaking with Fletcher for a moment, Morales nudged Fletcher awake, and pointed toward the end of the street. (ECF No. 114, Ex. 1-C at 55:11-55:54). At this time, Morales called two other DPD Officers—Todd and Morris—as well as DFR Paramedics—Clark and Cox—to the scene. (ECF No. 34 at 6). It is undisputed that Fletcher had a wound on the back of his head. (ECF No. 34 at 6; ECF No. 111 at

3-4). As heard in DPD Officer Morris's bodycam video, one of the officers' states "that is a pretty big bump" when examining Fletcher's head. (ECF No. 114, Ex. 1-D at 1:30). However, it is disputed whether Fletcher made statements to the DPD Officers and DFR Paramedics that he hurt his head and needed medical attention, and whether he stated that he had been drinking beer. (ECF No. 34 at 6; ECF No. 111 at 5). It is also disputed whether Fletcher had slurred speech, bloodshot eyes, and breath smelling of alcohol. (ECF No. 111 at 4).

All DPD Officers and DFR Paramedics assumed Fletcher to be drunk, although the reasoning behind this conclusion is disputed. (ECF No. 34 at 6; ECF No. 111 at 3-5). The DPD Officers and DFR Paramedics congregated around Fletcher for approximately 10 minutes, asking him a series of questions. (ECF No. 34 at 6; ECF No. 120, Exs. 1-B, 1-C; ECF No. 114, Ex. 1-D). Fletcher's answers are somewhat obscured, but when the sound is clear, Fletcher's words are slurred and difficult to make out. (ECF No. 120, Exs. 1-B, 1-C; ECF No. 114, Ex. 1-D). Officer Morris's body camera and the in-car cameras both depict the DPD Officers and DFR Paramedics laughing and joking throughout the examination and arrest. (ECF No. 120, Exs. 1-B, 1-C; ECF No. 114, Ex. 1-D).

Thereafter, Fletcher was arrested for public intoxication and taken to the Detention Facility at around 8:00 p.m. on December 30, 2016. (ECF No. 34 at 7). It is once again disputed whether Fletcher made statements that his head hurt, and whether he requested medical attention while in transit. (ECF No. 34 at 7; ECF No. 111 at 5). Defendants Morales, Todd, Morris, and another officer, Harry Bradfield, booked Fletcher in the Detention Facility. (ECF No. 34 at 7). As alleged, Fletcher stated to Bradfield that he was mentally ill and/or mentally retarded. (ECF No. 34 at 8).

Fletcher spent much of the time at the Detention Center lying unresponsive underneath a mattress in the cell. (ECF No. 34 at 8). As alleged, the CDC Officers intermittently walked by the

cells—including Fletcher's—without actually checking on the physical condition of the detainees. (ECF No. 34 at 8). At 5:00 a.m. on December 31, 2016, Fletcher was found unresponsive in his cell at the Detention Facility. (ECF No. 34 at 8). He was then rushed to the hospital, where he died later that evening. (ECF No. 34 at 8).

On August 2, 2019, Kelson filed his Second Amended Complaint, asserting five counts under 42 U.S.C. § 1983: (1) false arrest against the DPD Officers in their individual capacities; (2) denial of medical treatment against both the DPD Officers and the CDC Officers, both in their individual capacities; (3) failure to treat against the DFR Paramedics; (4) *Monell* liability against the City of Dallas; and (5) wrongful death against all defendants. (ECF No. 34). On August 4, 2020, Defendants City of Dallas, James Hernandez, George Morales, Nicholas Morris, Christopher Todd, and DSO Warren filed their Motion for Summary Judgment to dismiss Kelson's claims on the grounds of qualified immunity. (ECF No. 111). The Individual Defendants filed their Brief in Support of the Motion for Summary Judgment, (ECF No. 112), and the City of Dallas filed their Brief in Support, (ECF No. 115-1). Additionally, the Defendants filed an Appendix to their Motion for Summary Judgment. (ECF No. 114). Plaintiffs responded to Defendants' Motion for Summary Judgment on August 25, 2020. (ECF No. 117). Plaintiffs filed their Brief in Support in Response to the Individual Defendants, (ECF No. 119), and their Brief in Support in Response to the City, (ECF No. 118). Additionally, Plaintiffs filed an Appendix to their Response to the Motion for Summary Judgment. (ECF No. 12). On September 16, 2020, the Individual Defendants filed a reply, (ECF No. 125), along with the City of Dallas, (ECF No. 124). Thus, the Motion has been fully briefed and is ripe for determination.

## II.   LEGAL STANDARD

### A.   Summary Judgment

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). A dispute of a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson*, 477 U.S. at 248. The moving party bears the burden of showing that summary judgment is appropriate. *Celotex Corp.*, 477 U.S. at 323. The moving party meets its burden by informing the Court of the basis of its motion and by identifying the portions of the record which reveal there are no genuine material fact issues. FED. R. CIV. P. 56; *Celotex Corp.*, 477 U.S. at 323.

When reviewing the evidence on a motion for summary judgment, the Court must decide all reasonable doubts and inferences in the light most favorable to the non-movant. *See Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). The Court cannot make a credibility determination in light of conflicting evidence or competing inference. *Anderson*, 477 U.S. at 255. As long as there appears to be some support for the disputed allegations such that "reasonable minds could differ as to the import of the evidence," the motion for summary judgment must be denied. *Anderson*, 477 U.S at 250.

### B.   Qualified Immunity

Under 42 U.S.C. § 1983, private citizens may sue public officials for violations of their federal statutory or constitutional rights. *See Monroe v. Pape*, 365 U.S. 167, 1717 (1961). However, public officials are shielded from civil liability under § 1983 under the doctrine of

qualified immunity "so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "Qualified immunity gives government officials breathing room to make reasonable[,] but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 571 U.S. 3, 5 (2013) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743) (internal quotation marks omitted).

The affirmative defense of qualified immunity has two prongs: (1) whether an official's conduct violated a statutory or constitutional right of the plaintiff, and (2) whether the right was "clearly established" at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223 (2009). The two steps of the qualified immunity inquiry may be performed in any order. *Pearson*, 555 U.S. at 236. "A court may rest its analysis on either prong[.]" *Dyer v. Houston*, 964 F.3d 374, 380 (5th Cir. 2020) (citation omitted).

The "clearly establish[ed]" prong of the qualified immunity analysis "'is better understood as two separate inquiries: [(1)] whether the allegedly violated constitutional rights were clearly established at the time of the incident; and, if so, [(2)] whether the conduct of the defendants was objectively unreasonable in light of that then clearly established law.'" *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005) (quoting *Felton v. Polles*, 315 F.3d 470, 477 (5th Cir. 2002)). "For a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Turner v. Lieutenant Driver*, 848 F.3d 678, 685 (5th Cir. 2017) (alteration in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "For conduct to be objectively unreasonable in light of clearly established law, there need not be a case directly on point, but 'existing precedent must have placed

the statutory or constitutional question beyond debate.'" *Tucker v. City of Shreveport*, 998 F.3d 165 (5th Cir.) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)), *cert. denied sub nom. Tucker v. City of Shreveport, Louisiana*, 211 L. Ed. 2d 388, 142 S. Ct. 419 (2021). "Thus, when considering whether a defendant is entitled to qualified immunity, [] court[s] 'must ask whether the law so clearly and unambiguously prohibited his conduct that *every* reasonable official would understand that what he is doing violates [the law]." *Turner*, 848 F.3d at 685-86 (emphasis and third alteration in original) (quoting *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc)). "To answer that question in the affirmative, [a court] must be able to point to controlling authority—or a 'robust consensus of persuasive authority'—that defines the contours of the right question with a high degree of particularity." *Morgan*, 659 F.3d at 371-72.

An officer's invocation of the qualified immunity defense "alters the usual summary judgment burden of proof." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010); *see also Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007). Where, as here, a defendant has properly asserted qualified immunity, "the plaintiff has the burden of negating the application of the doctrine." *Griggs v. Brewer*, 841 F.3d 308, 312 (5th Cir. 2016). The plaintiff must "rebut the defense by establishing that the official's allegedly wrongful conduct clearly violated clearly established law and that genuine issues of material fact exist regarding the reasonableness of the official's conduct." *Gates v. Texas Dep't. of Protective and Regul. Servs.*, 537 U.S. 404, 419 (5th Cir. 2008).

While the invocation of qualified immunity alters the typical burden of proof, the Fifth Circuit has explained that:

> At the summary judgment stage . . . all inferences are still drawn in the plaintiff's favor. [*Brown*, 623 F.3d] at 253. This is true "even when ... a court decides only the clearly-established prong of the [qualified immunity] standard." *Tolan v. Cotton*, 572 U.S. 650, 657, 134 S.Ct. 1861, 188 L.Ed.2d 895 (2014). Likewise, "under

> either [qualified immunity] prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id.* at 656, 134 S.Ct. 1861. "Accordingly, courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Id.* at 657, 134 S.Ct. 1861; *see, e.g., Tarver*, 410 F.3d at 754 (dismissal at summary judgment phase inappropriate because determining whether officer's conduct was objectively unreasonable in light of clearly established law required factfinding and credibility assessments).

*Tucker*, 998 F.3d at 173. While a plaintiff's version of the facts is generally accepted as true in a motion for summary judgment based on qualified immunity, a "narrow exception" to this approach exists where "video evidence undeniably contradicts the plaintiff's version of the facts such that no reasonable jury could believe it." *Chacon v. Copeland*, 577 F. App'x 355, 358 (5th Cir. 2014) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)). When such video evidence exists, the Fifth Circuit has said that courts "need not rely on the plaintiff's description of the facts . . . but instead consider 'the facts in the light depicted by the videotape.'" *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011) (quoting *Scott*, 550 U.S. at 381).

Finally, whether every reasonable officer would consider a defendant's conduct to violate clearly established law is an "objective (albeit fact-specific) question." *Creighton*, 483 U.S. at 641. Thus, "[w]hen evaluating a qualified immunity defense, [courts] 'consider[] only the facts that were knowable to the defendant officers.'" *Tucker*, 998 F.3d at 173 (quoting *White*, 580 U.S. at 77). Accordingly, a defendant's subjective state of mind has no bearing on whether he or she is entitled to qualified immunity. *Creighton*, 483 U.S. at 641.

## III. ANALYSIS

Kelson asserts five counts of constitutional violations under 42 U.S.C. § 1983. First, Kelson asserts a claim of false arrest under the Fourth and Fourteenth Amendments against the DPD Officers: Morales, Todd, and Morris, in their individual capacities. Second, Kelson asserts a claim of denial medical treatment under both the Eighth and Fourteenth Amendments against the DPD

---

Officers: Morales, Todd, and Morris; and the CDC Officers: Hernandez and Warren. Third, Kelson asserts a claim of failure to treat against the DFR Paramedics: Cox and Clark. They are not a party to the motion for summary judgment, and thus this claim will not be addressed. Fourth, Kelson asserts a *Monell* claim against the City of Dallas. Fifth, Kelson asserts a wrongful death claim against all defendants. This claim was abandoned at the motion to dismiss stage—thus it will not be addressed. The Court will first address Kelson's false arrest claim.

### A.      Count One—False Arrest

Kelson asserts a false arrest claim against the DPD Officers under both the Fourth and Fourteenth Amendments. Kelson's argument under the Fourteenth Amendment fails as a matter of law because "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the mere generalized notion of substantive due process, must be the guide for analyzing such a claim." *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (citation and quotation marks omitted). "We do hold that substantive due process, with its scarce and open-ended guideposts, can afford him no relief." *Albright*, 510 U.S. at 273 (quoting *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992)). Thus, we need only address Kelson's false arrest claim under the Fourth Amendment.

The DPD Officers argue that they are entitled to qualified immunity on Kelson's false arrest claim because Kelson failed to establish or raise a genuine dispute that the DPD Officers lacked probable cause (or arguable probable cause) to arrest Fletcher for public intoxication. (ECF No. 112 at 13). The Court agrees and concludes that the DPD Officers are entitled to qualified immunity on the false arrest claim as both prongs of the affirmative defense of qualified immunity fail: (1) their conduct did not violate a constitutional right of Kelson's, (2) nor was such right

---

MEMORANDUM OPINION AND ORDER

clearly established at the time of the alleged violation. The Court will discuss both prongs, beginning with the constitutional violation analysis.

      *1.*    *Constitutional Violation*

Individuals possess a "Fourth Amendment right to be free from false arrest." *Dent v. Methodist Health Sys.*, No. 3:20-CV-00124-S, 2021 WL 75768, at *4 (N.D. Tex. Jan. 8, 2021). The Fifth Circuit has held this right is clearly established. *Dent*, 2021 WL 75768, at *4; *see Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 206 (5th Cir. 2009). To establish that the DPD Officers violated Kelson's Fourth Amendment rights by arresting him, Kelson must show that the DPD Officers lacked probable cause for the arrest. *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009).

"A warrantless arrest must be based on probable cause." *Resendiz v. Miller,* 203 F.3d 902, 903 (5th Cir. 2000). "Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Resendiz,* 203 F.3d at 903; *Beck v. Ohio*, 379 U.S. 89, 91 (1964) ("Whether [the] arrest was constitutionally valid depends [ ] upon whether . . . the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense."). "The probable cause analysis only requires that we find a basis for an officer to believe to a fair probability that a violation occurred*." Piazza v. Mayne*, 217 F.3d 239, 246 (5th Cir. 2000). "Authority in this Circuit holds that once probable cause exists, the collateral bad or evil motive of the arresting officer is immaterial." *Graham v. Dallas Area Rapid*

*Transit*, 288 F. Supp. 3d 711, 739 (N.D. Tex. 2017); *see Hunter v. Clardy*, 558 F.2d 290, 292 (5th Cir. 1977).

“When qualified immunity is raised, ‘the plaintiff must show that the officers could not have reasonably believed that they had probable cause to arrest the plaintiff for any crime.’” *Sarabia v. Hockenberry*, No. 5:10-CV-006-C, 2010 WL 11561761, at *4 (N.D. Tex. Oct. 25, 2010) (quoting *O'Dwyer v. Nelson*, 310 Fed.Appx. 741, 745 (5th Cir. 2009)). “[I]t is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present . . . [and those] officials who act in ways they reasonably believe to be lawful [] should not be held personally liable.” *Anderson*, 483 U.S. at 641. “The relevant question . . . is the objective (albeit fact-specific) question whether a reasonable officer could have believed [the officers’] warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed.” *Anderson*, 483 U.S. at 641. In that event, the officer is entitled to summary judgment on qualified immunity grounds. *See Anderson*, 483 U.S. at 641 (holding that the Court has previously extended qualified immunity to officials who were alleged to have violated the Fourth Amendment). “To the extent that the underlying facts are disputed, we may resolve questions of probable cause as questions of law.” *Piazza*, 217 F.3d at 246.

Here, the DPD Officers had “arguable (that is, reasonable but mistaken) probable cause” for arresting Fletcher for public intoxication. *Club Retro*, 568 F.3d at 206. In Texas, a person commits an offense of public intoxication—an arrestable offense— “if the person appears in a public place while intoxicated to the degree that the person may endanger the person or another.” Tex. Pen. Code. § 49.02(a).

As shown in the Stewpot surveillance, (ECF No. 114, Ex. 1-C at 53:16), Officer Morales was flagged down by a bystander who asked Officer Morales to take Fletcher—who was passed

out and covered in feces—to detox. (ECF No. 114 at 133). When Morales approached Fletcher, he noticed a bump and cut with crusted blood on his head, and that Fletcher's pants were covered in feces. (ECF No. 111 at 4). As shown, Morales roused Fletcher by nudging him with his foot and had Fletcher walk down the street. (ECF No. 114, Ex. 1-C at 55:14-56:35). Fletcher's gait was slow and unsteady. (ECF No. 120, Ex. 1-B 0:00-0:06). At the corner, Morales observed that "Fletcher had slurred speech, bloodshot eyes, breath smelling of alcohol, unsteady balance, and was having a hard time standing." (ECF No. 111 at 4). Morales called for backup and Officers Todd and Morris arrived—both noting Fletcher's speech was slurred and that he was covered in feces and had a head wound. (ECF No. 111 at 4-5).

Once the DFR Paramedics arrived, Todd told them about the feces and Fletcher's head wound. (ECF No. 111 at 5). Officer Morales held the flashlight while the DFR Paramedics talked with Fletcher and examined his head wound. (ECF No. 111 at 5). During this examination, Fletcher was cooperative and showed no signs of distress. (ECF No. 111 at 5). As alleged and thus believed by the DFR Paramedics, Fletcher admitted to the DFR Paramedics that he had been drinking beer. (ECF No. 111 at 5).

As stated in the Investigative Information, Officer Morales was told by the DFR Paramedics after they observed Fletcher that "the injury on the back of his head was old and that the comp did not require any medical attention." (ECF No. 114 at 133). Thus, "[r]elying on the paramedics' conclusion that Fletcher did not require medical attention, Morales arrested Fletcher for public intoxication." (ECF No. 111 at 5). "The veracity and basis of knowledge of the person supplying the hearsay information are relevant considerations in evaluating whether probable cause exists." *Moreno v. Dretke*, 450 F.3d 158, 170 (5th Cir. 2006). "Texas courts presume that a police officer is a reliable source and no special showing is required for a magistrate to rely on

their hearsay declarations." *Moreno*, 450 F.3d at 170. Thus, all three DPD Officers—who are not medical professionals—reliance on the DFR Paramedics' statements, is reasonable. Further, the three DPD Officers believed Fletcher was intoxicated to an extent that he could not care for himself or could be victimized by others. (ECF No. 111 at 5); *See* Tex. Pen. Code. § 49.02(a) (a person may be arrested for public intoxication "if the person appears in a public place while intoxicated to the degree that the person may endanger the person or another").

Kelson argues that the DPD Officers did not have probable cause to arrest Fletcher for public intoxication. Kelson states that Fletcher did not have any alcohol in his system, and that the DPD Officers' contact with Fletcher is too minimal to support their conclusion that Fletcher was intoxicated. (ECF No. 119 at 13). Additionally, Kelson argues that the DFR Paramedics—who had the most contact with Fletcher—state that Fletcher was not intoxicated. (ECF No. 119 at 13). Kelson cites to DFR Officers Cox and Clark's internal statements as evidence that Fletcher was not intoxicated. (ECF No. 119 at 13-14). Additionally, Kelson argues that the DPD Officers "know that certain illnesses and injuries may have symptoms similar to intoxication which requires them to assess further as to whether a person is in fact intoxicated." (ECF No. 119 at 14).

What Kelson fails to consider in his argument is that probable cause turns on what the officers knew at *the moment of arrest*. *See Resendiz,* 203 F.3d at 903 (emphasis added). "Qualified immunity gives ample room for mistaken judgements, by protecting all but the plainly incompetent or those who knowingly violate the law." *Brown v. Lyford*, 243 F.3d 185, 190 (5th Cir. 2001). At the time of arrest, the DPD Officers were not aware that Fletcher suffered from schizophrenia and myotonic dystrophy—causing a speech impediment—or that he had been attacked and punched in the head—causing TBI—a few hours earlier. What they did know was that Fletcher had slurred speech, an unsteady gait, a head wound, and was covered in feces. Even if the DPD Officers did

not state that Fletcher had bloodshot eyes and smelled of alcohol—which they did—the facts enumerated would lead a reasonable officer in the DPD Officers position to believe that Fletcher was intoxicated and a potential danger to himself. Like the situation here, in *Miller v. SS Hospitality Group*, the Court concluded that the officers had probable cause to arrest the plaintiff for public intoxication. *Miller v. SS Hosp. Grp., LLC*, No. 4:17-CV-00847-O, 2018 WL 3054691, at *5 (N.D. Tex. June 5, 2018). In *Miller*, the officers' reports stated that the plaintiff "showed signs of intoxication, including bloodshot watery eyes, slurred speech, and unsteadiness." 2018 WL 3054691 at *5. Thus, at the time of arrest, the officers' belief that the plaintiff was intoxicated based on what they observed *at that time*, was reasonable. *Miller*, 2018 WL 3054691 at *5 (emphasis added). Such is the situation here.

Kelson has not carried his burden of establishing that probable cause is lacking; rather, the DPD Officers have established sufficient evidence to conclude that at the time of Fletcher's arrest it was reasonable (even if mistaken) to believe Fletcher was intoxicated to a degree that he was a potential danger to himself. *See Club Retro*, 568 F.3d at 206 (arguable probable cause exists when an officer is reasonable but mistaken). Thus, the DPD Officers are entitled to qualified immunity on Kelson's false arrest claim because they had probable cause to arrest Fletcher for public intoxication.

### 2.    *Clearly Established Law*

In the alternative, the DPD Officers are entitled to summary judgment on Kelson's false arrest claim because Kelson has not met his heavy and demanding burden of showing that the DPD Officers alleged false arrest of Fletcher violated clearly established law. *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019) (the question of "whether the officer violated clearly established law—is a doozy"). Although the Supreme Court "caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or

---

constitutional question beyond debate." *Kisela v. Hughes*, 548 U.S. —, 138 S. Ct. 1148, 1152 (2018). "It is the plaintiff's burden to find a case in his favor that does not define the law at a high level of generality." *Vann v. City of Southaven*, 884 F.3d 307, 310 (5th Cir. 2018). "The hurdle is even higher when the plaintiff alleges a Fourth Amendment violation." *Henderson v. Harris Cnty., Texas*, 51 F.4th 125, 132 (5th Cir. 2022). "[O]utside of an obvious case, the law is only clearly established if a prior case exists where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *Hanks v. Rogers*, 853 F.3d 738, 747 (5th Cir. 2017). If, however, officers of "reasonable competence could disagree on [whether the conduct is legal], immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Kelson fails to cite any established case law except for his proposition that a court "must also look to the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational fact finder that the officer acted unreasonably." (ECF No. 19 at 14). He cites to three cases for this proposition: *Abraham v. Raso*, 183 F.3d 279, 294 (3rd Cir. 1999); *Hopkins v. Andaya*, 958 F.2d 881, 885 (9th Cir. 1992); and *Herrin v. Treon*, 459 F.Supp.2d 525, 541 (N.D. Tex. 2006). Kelson simply cites to these three cases, he does not offer any evidence or details pertaining to how they are analogous to his situation.

First, it must be noted that *Abraham* and *Hopkins* are persuasive authority only and not controlling, as they are Third Circuit and Ninth Circuit cases, respectively. In both of these cases, the circuit courts reversed the district courts—holding that material issues of fact precluded granting summary judgment in favor of defendants. In *Abraham*, the Fourth Amendment claim is for excessive force, and not for false arrest. 183 F.3d at 294. Right off the bat, the difference in claims makes this case unqualified to "place the constitutional question beyond debate." *See*

*Kisela*, 138 S. Ct. at 1152. Further, *Abraham* involves a police chase after the plaintiff was caught stealing clothing at Macy's department store, leading to the plaintiff attempting to hit the officer with his car, causing the officer to then fire at the plaintiff. 183 F.3d at 283-85. Nothing about this case is analogous to Kelson's situation. Additionally, *Hopkins* has been overruled—lending less credibility to Kelson's reliance on this authority. 958 F.2d at 885. In *Hopkins*, the officer shot the plaintiff after the plaintiff acted in a threatening manner toward the officer. 958 F.2d at 883-84. In both *Abraham* and *Hopkins*, the officers used deadly force after the plaintiffs acted in a violent and threatening manner. Here, the DPD Officers never claimed that Fletcher acted violently or threateningly—rather they arrested him for fear of harm to himself by his alleged intoxication.

Further, although *Herrin* is a Northern District of Texas case, it cannot suffice as clearly established law with analogous facts, as the claims alleged in this case are under the Eighth and Fourteenth Amendments. 459 F.Supp.2d at 541. The false arrest claim at issue here is brought under the Fourth Amendment.

These cases Kelson cites to are not sufficiently analogous to the facts at issue. Thus, Kelson has not carried his burden of showing that the DPD Officer's actions violated clearly established law, and the Court must grant qualified immunity as to the DPD Officers. The DPD Officers are entitled to qualified immunity on both prongs, and summary judgment must be granted in favor of the DPD Officers on Kelson's false arrest claim.

### B.    Count Two—Denial of Medical Treatment

Kelson asserts a denial of medical treatment claim under the Eighth and Fourteenth Amendments in violation of 42 U.S.C. § 1983 against the DPD Officers—Morales, Todd, and Morris—and the CDC Officers—Hernandez and Warren. The rights of a pretrial detainee to medical treatment are protected under the Fourteenth Amendment, whereas those of a convicted

prisoner are protected under the Eighth Amendment. *Bell v. Wolfish*, 441 U.S. 520, n.16 (1979). "The constitutional rights of a convicted state prisoner spring from the Eighth Amendment's prohibition on cruel and unusual punishment, and, with a relatively limited reach, from substantive due process." *Hare v. City of Corinth,* 74 F.3d 633, 639 (5th Cir. 1996) (internal citations omitted). "The constitutional rights of a pretrial detainee, on the other hand, flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment." *Hare,* 74 F.3d at 639. Although it is immaterial as the same standard has been applied to pretrial detainees under the Fourteenth Amendment, as well as convicted inmates under the Eighth Amendment, the Court will only address this claim under the Fourteenth Amendment as Kelson never argues that Fletcher is a convicted prisoner and only brings the denial of medical treatment claim under the Fourteenth Amendment in their response to the motion for summary judgment. (ECF No. 119 at 16). *See Hare,* 74 F.3d at 648; *see also Nerren v. Livingston Police Dept.*, 86 F.3d 469, 472 (5th Cir. 1996) ("[W]e make explicit that which was heretofore either implicit or taken for granted in our case law: An arrestee's complaint for denial of substantive due process and a pretrial detainee's complaint for denial of substantive due process are evaluated under the same standards.").

    *1.   Constitutional Violation*

For denial of medical treatment claims, "[t]he appropriate standard to apply in analyzing constitutional challenges brought by pretrial detainees depends on whether the alleged unconstitutional conduct is a condition of confinement or episodic act or omission." *Tamez v. Manthey*, 589 F.3d 764, 769 (5th Cir. 2009) (internal quotations omitted). "An action is characterized properly as an episodic act or omission case when the complained-of harm is a particular act or omission of one or more officials." *Tamez*, 589 F.3d at 769. "If a case falls under the episodic act or omission category, we apply the deliberate indifference standard." *Tamez*, 589 F.3d at 769.

---

The present challenge involves an episodic act or omission under our case law. *See Brown v. Strain*, 663 F.3d 245, 249 (5th Cir. 2011) (analyzing allegations that an officer refused to provide a detainee with immediate medical treatment as an "episodic act or omission" case). Thus, Kelson must prove that the DPD Officers and the CDC Officers each acted with subjective deliberate indifference to Fletcher's need for medical care. *See Westfall v. Luna*, 903 F.3d 534, 551 (5th Cir. 2018).

"To establish a constitutional violation, a plaintiff must show that the defendant: (1) was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; (2) subjectively drew the inference that the risk existed; and (3) disregarded the risk." *Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019); *see Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 279 (5th Cir. 2015) ("The plaintiff must show that an officer acted with subjective knowledge of a substantial risk of serious medical harm, followed by a response of deliberate indifference."). "Deliberate indifference is an extremely high standard to meet." *Rose v. Dallas Cnty., Texas*, No. 3:19-CV-01240-E, 2020 WL 5815902, at *4 (N.D. Tex. Sept. 30, 2020). "To prove deliberate indifference, a pretrial detainee must show that the state official knew of and disregarded an excessive risk to the inmate's health or safety." *Gibbs v. Grimmette*, 254 F.3d 545, 549 (5th Cir. 2001). "Deliberate indifference is more than mere negligence in failing to supply medical treatment." *Gibbs*, 254 F.3d at 549. "To defeat qualified immunity, the plaintiffs must establish that the officers . . . were aware of a substantial and significant risk . . . but effectively disregarded it." *Jacobs v. West Feliciana Sheriff's Dept.*, 228 F.3d 388, 395 (5th Cir. 2000). "A plaintiff must show that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Mason*, 806 F.3d at 279 (internal quotations omitted).

---

MEMORANDUM OPINION AND ORDER

(i)      DPD Officers: Morales, Todd, and Morris

In order to defeat qualified immunity as to the DPD Officers on the denial of medical treatment claim, Kelson must prove the DPD Officers acted with deliberate indifference. This is an incredibly high standard—Kelson must prove that each DPD Officer had subjective knowledge of Fletcher's medical needs and responded with deliberate indifference. *See Jacobs*, 228 F.3d at 395; *Mason*, 806 F.3d at 279.

Kelson argues that at all times the DPD Officers knew of Fletcher's traumatic head injury and "at the time the Arresting Officers interacted with Fletcher, they knew of the significant risk that severe blunt force trauma to the head can cause and disregarded it by choosing to harass and laugh at Fletcher and ignore the obvious signs of distress and injury, instead of rendering medical care, which ultimately resulted in Fletcher's death." (ECF No. 119 at 18). Kelson's allegations that the DPD Officers had subjective knowledge of Fletcher's medical condition, and blatantly refused to help, are not supported by evidence. Repeatedly, Kelson merely asserts that "Defendants Morales, Todd, and Morris had the common medical knowledge that severe beatings, like the ones suffered by Fletcher, can cause brain damage leading to death." (ECF No. 34 at 6). Once again, these are mere conclusory assertions, without supporting evidence.

Kelson further alleges that the DPD Officers' reliance on the DFR Paramedics opinion that the injury was old and did not require medical attention is unfounded, as the DFR Paramedics actions "amounted to inadequate and inappropriate medical care." (ECF No. 119 at 19-20). In arguing that such reliance is reasonable, the DPD Officers rely on *Davalos v. Johns*. No. 3:11-cv-0222-P, 2013 WL 1820313 (N.D. Tex. Apr. 30, 2013). In *Davalos*, the Court states that, "[u]nless it would be evident to a lay person that a person is receiving inadequate or inappropriate treatment, non-medical personnel, like police officers, may properly rely on an examination by medical

personnel to determine whether a serious medical need exits and whether further medical care should be administered." 2013 WL 1820313, at *10. Kelson argues that this reliance on *Davalos* is unfounded, as "Fletcher displayed almost cartoonish symptoms of a serious head injury—large bump on head, blood on head, recent unconsciousness, slurred speech, difficulty walking, soiled clothing—that would put even a layperson on notice that he needed immediate medical care," and thus the DFR Paramedics conclusion that Fletcher did not need medical attention was evidently inadequate. (ECF No. 119 at 20). However, the DPD Officers attributed such characteristics to drunkenness, and since deliberate indifference requires "subjective knowledge" on the part of each defendant, it is reasonable for the DPD Officers to rely on the DFR Paramedics conclusion that the wound was old and did not require medical assistance, as the DPD Officers did not have subjective knowledge of Fletcher's medical needs. *See Mason*, 806 F.3d at 279. As in *Davalos*, where the court found the police officer's reliance on the paramedic's conclusion that the plaintiff did not need medical attention was reasonable, here, the Court concludes that the DPD Officers' reliance on the DFR Paramedics conclusion was reasonable. *See* 2013 WL 1820313, at *10. Thus, there is no constitutional violation, and the DPD Officers are entitled to qualified immunity on Kelson's denial of medical treatment claim.

(ii)    CDC Officers: Hernandez and Warren

In order to defeat qualified immunity as to the CDC Officers on the denial of medical treatment claim, Kelson must prove the CDC Officers acted with deliberate indifference. This is an incredibly high standard—it must be proven that each CDC Officer had subjective knowledge of Fletcher's medical needs and responded with deliberate indifference. *See Jacobs*, 228 F.3d at 395; *Mason*, 806 F.3d at 279. Kelson argues that the CDC Officers' conduct amounted to deliberate indifference toward Fletcher:

---

> Fletcher presented at the jail with a head injury, was bleeding, was nonresponsive, the defendants were aware of his head injury and symptoms, the defendants only checked on Fletcher one time and saw that the state he was in had not improved as he laid on the ground unresponsive in his own blood and feces for eight hours, and they chose to do nothing.

(ECF No. 119 at 21). The CDC Officers were not present for Fletcher's arrest nor were they involved in his examination by the paramedics. The CDC Officers' knowledge regarding Fletcher consisted solely of the report given to them by the DPD Officers upon intake and what they actually observed. In order to raise a sufficient fact issue as to the CDC Officers' knowledge of Fletcher's medical needs, Kelson must show that the CDC Officers had actual knowledge of his medical needs.

A case seemingly analogous to Kelson's situation is *Rose v. Dallas County*. 2020 WL 5815902, at *6. In *Rose*, the plaintiff asserts that upon his arrival at the Dallas County Jail he was able to walk, talk, and care for himself. 2020 WL 5815902, at *1. He alleges that after suffering multiple strokes in jail, he was unable to speak, respond, move, or eat, but was not taken to the hospital due to the officers' failure to monitor him. *Rose*, 2020 WL 5815902, at *1-2. The plaintiff asserted a claim of denial of medical treatment against the officers, and the Court granted summary judgment in favor of the officers, finding such claim was unfounded. *Rose*, 2020 WL 5815902, at *7. In *Rose*, the Court concluded that "[i]t is not clear from the evidence when or how often each individual Defendant saw Plaintiff in the jail." *Rose*, 2020 WL 5815902, at *6. "Even if the Court assumes that from making the rounds in the jail, Defendants had some knowledge of Plaintiff's muteness and inability to take care of the activities of daily living, that knowledge is just not sufficient to raise a fact issue as to Defendants' knowledge of any excessive risk to Plaintiff's health." *Rose*, 2020 WL 5815902, at *6. "There is nothing to show that any of them had actual knowledge of Plaintiff's medical circumstances or his risk of stroke." *Rose*, 2020 WL 5815902, at

*6. This case is analogous to the situation at hand, as the CDC Officers made rounds in the Detention Center, as shown in the video. (ECF No. 120, Ex. 1-D). However, the only factual allegation that could indicate the CDC Officers had actual knowledge of Fletcher's medical needs was that "Fletcher spent much of his time at the Detention Center lying unresponsive underneath a mattress in the cell." (ECF No. 34 at 8). This knowledge is not sufficient to raise a fact issue as to the CDC Officers' knowledge of any excessive risk to Fletcher's health. *See Rose*, 2020 WL 5815902, at *6.

Thus, because Kelson cannot show that both CDC Officers—Hernandez and Warren—had subjective knowledge of Fletcher's medical needs and responded with deliberate indifference, there is no constitutional violation. *See Mason*, 806 F.3d at 279 ("The plaintiff must show that an officer acted with subjective knowledge of a substantial risk of serious medical harm, followed by a response of deliberate indifference."). Both CDC Officers are entitled to qualified immunity, and summary judgment must be granted as to the CDC Officers on Kelson's denial of medical treatment claim.

## 2.    *Clearly Established Law*

Although Kelson cannot establish a constitutional violation by either the DPD Officers or CDC Officers on the denial of medical treatment claim, alternatively, Kelson's attempt to defeat qualified immunity also fails as to clearly established law. For the second prong of the qualified immunity analysis, Kelson bears the burden of identifying a case that proves the law was clearly established at the time of the alleged Fourteenth Amendment violation. "The law is clearly established if there is factually similar, controlling case law from this court or the Supreme Court." *Mason*, 806 F.3d at 277. "It is the plaintiff's burden to find a case in his favor that does not define the law at a high level of generality." *Vann*, 884 F.3d at 310. "When considering a defendant's entitlement to qualified immunity, we must ask whether the law so clearly and unambiguously

prohibited his conduct that every reasonable official would understand that what he is doing violates the law." *Morgan*, 659 F.3d at 371. "To answer that question in the affirmative, we must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Morgan*, 659 F.3d at 371–72.

(i)     DPD Officers: Morales, Todd, and Morris

With regard to Kelson's denial of medical treatment claim as to the DPD Officers, Kelson fails to cite any controlling or even persuasive precedent to prove the clearly established prong. That alone dooms the case. *See Vann*, 884 F.3d at 310 (holding that the district court properly granted summary judgment in favor of defendant when plaintiff "cited nary a pre-existing or precedential case"). Rather, Kelson merely refutes Defendants' reliance on *Davlos*. 2013 WL 1820313, at *10. Kelson bears the burden of showing specific caselaw on point and wholly fails to meet this burden. *See Vann*, 884 F.3d at 310; *Cass v. City of Abilene*, 814 F.3d 721, 732-33 (5th Cir. 2016) (granting qualified immunity because plaintiffs did not meet the burden of showing specific law on point). Thus, qualified immunity must be granted to the DPD Officers on Kelson's claim of denial of medical treatment. The DPD Officers are entitled to qualified immunity on both prongs, and summary judgment must be granted in favor of the DPD Officers on Kelson's denial of medical treatment claim.

(ii)    CDC Officers: Hernandez and Warren

In alleging denial of medical treatment by the CDC Officers, Kelson cites to many cases to assert that the law is clearly established on this point. But many of the cases Kelson relies on are "irrelevant to the clearly-established inquiry—either because they issued too late or they do not bind us (and hence do not give officers in our circuit fair notice of the law)." *Henderson*, 51

---

F.4th at 133. Further, the remaining cases Kelson cites that could potentially supply clearly establish law do not do so at the requisite specificity. *See Henderson*, 51 F.4th at 133.

First, multiple of the cases Kelson cites are unpublished opinions. "Unpublished opinions do not establish any binding law for the circuit" so "they cannot be the source of clear established law for the qualified immunity analysis." *Henderson*, 51 F.4th at 133 (quoting *Marks v. Hudson*, 933 F.3d 481, 486 (5th Cir. 2019). Thus, this rule eliminates the bulk of authorities Kelson relies on. *See Rodriguez v. Bexar Cnty.*, No. SA-18-CV-248-XR, 2018 WL 4431433, at *7 (W.D. Tex. Sept. 17, 2018); *Galvan v. Calhoun Cty.*, 719 Fed.App'x. 372, 375 (5th Cir. 2018); *Williams v. Certain Individual Employees of Texas Dep't of Criminal Justice-Institutional Div. at Jester III Unit, Richmond, Texas*, 480 Fed.App'x. 251, 257-58 (5th Cir. 2010); *Stewart v. Guzman*, 555 Fed.App'x 425, 432 (5th Cir. 2014); *Rodrigue v. Grayson*, 557 Fed.App'x 341, 347 (5th Cir. 2014); *Rodrigue v. Morehouse Det. Ctr.*, No. CIV.A. 09-0985, 2010 WL 5301015, at *3 (W.D. La. Dec 20, 2010*); Brown v. Cain*, 546 Fed.App'x 47, 475 (5th Cir. 2013).

Second, several of Kelson's cases came too late to supply clearly established law. All of the events surrounding Fletcher's contact with the CDC Officers occurred on or about December 30, 2016, and December 31, 2016. "Any cases after that date cannot show clearly established law at the time of the violation." *Henderson*, 51 F.4th at 133; *see also Kisela*, 138 S. Ct. at 1152 ("police officers are entitled to qualified immunity unless *existing precedent* squarely governs the facts at issue) (emphasis added). This eliminates two of Kelson's cases, both of which have already been dispatched by the unpublished rule above. *See Rodriguez*, 2018 WL 4431433, at *7; *Galvan*, 719 Fed.App'x. at 375.

Finally, Kelson invokes only three published Fifth Circuit Opinions: *Easter v. Powell*, 467 F.3d 459 (5th Cir. 2006); *Harris v. Hegman*, 198 F.3d 153 (5th Cir. 1999); and *Walker v. Butler*,

967 F.2d 176 (5th Cir. 1992). Yet, Kelson relies on these cases for general statements of law—insufficient to prove clearly established law. *See Kisela*, 138 S. Ct. at 1153. All three cases stand for the proposition that "failure to provide or delay in providing medical treatment when the medical condition is known amounts to a violation of clearly established law." (ECF No. 119 at 22). This is not in dispute—what is disputed is whether the CDC Officers had subjective knowledge that Fletcher needed medical treatment. In *Easter*, a prison inmate repeatedly complained of chest pain and went to the prison infirmary for medication. 467 F.3d at 461. The Fifth Circuit reversed a grant of summary judgment on qualified immunity grounds in favor of the nurse, concluding that the nurse offered the inmate no treatment options when he had a history of cardiac problems, was experiencing severe chest pain, and did not have his prescribed heart medication—all of which was well known to the nurse. *Easter*, 467 F.3d at 463-65. This is unlike Kelson's situation. The only factual allegations that could impute knowledge to the CDC Officers is that "Fletcher spent much of the time at the Detention Center lying unresponsive underneath a mattress in the cell." (ECF No. 34 at 8). Further, Kelson only makes inferences, not facts, to support his proposition that the CDC Officers had knowledge of Fletcher's condition and yet were deliberately indifferent. "[I]t was patently obvious that he was hurt and required medical care while he was detained in the Detention Center." (ECF No. 34 at 8). "Defendants Hernandez and Warren followed the Detention Facility's policy and practice of merely walking by cells intermittently without actually checking on the physical condition of the detainees . . . [they] possessed the knowledge that many of their detainees may be in physical distress due to being involved in physical altercations (like Fletcher) or overuse of drugs and alcohol (unlike Fletcher) and that failing to frequently check on their physical condition can result in a detainee dying from injuries and/or drug and alcohol abuse." (ECF No. 34 at 8). Thus, it is undisputed that the CDC Officers

followed the CDC's policies when checking on Fletcher. Further, this situation shares no synonymity with *Easter*—the CDC Officers had no medical history on Fletcher nor was he asking for help while incarcerated and being denied.

Similarly, in *Harris*, a prison inmate was treated for a broken jaw, and immediately after such treatment continued to complain that his jaw was still broken. 198 F.3d at 154-55. The inmate was denied treatment multiple times after constant requests and complaints of excruciating pain. *Harris*, 198 F.3d at 154-55. Once again, *Harris* does not provide an analogous factual basis to the situation here. The CDC Officers did not treat Fletcher for any medical condition, nor did they have knowledge of such, nor did they ignore any requests for help or complaints of pain. Both *Easter* and *Harris* allege deliberate indifference against a medical professional who had knowledge of the plaintiff's medical condition—the CDC Officers are not medical professionals, nor had they been privy to treating Fletcher previously.

The third published opinion Kelson relies on, *Walker*, evidences a conclusion directly contrary to Kelson's position. 967 F.2d at 178. In *Walker*, a prison guard fell on an inmate's leg while breaking up a fight, fracturing the inmate's ankle. 967 F.2d at 178. The prison guard then made the inmate walk to the hospital. *Walker*, 967 F.2d at 178. After the district court concluded this amounted to deliberate indifference on behalf of the prison guard, the Fifth Circuit reversed, concluding that the prison guard did not act with deliberate indifference—his conduct was "not wanton and did not involve a reckless disregard of [the inmate's] rights." *Walker*, 967 F.2d at 178. Thus, the Court concludes Kelson incorrectly relied on this case, and it cannot support a conclusion of clearly established law.

Kelson fails to cite any "factually similar, controlling case law from this court or the Supreme Court." *Mason,* 806 F.3d at 277. As Kelson has not met his burden of finding "a case in

his favor that does not define the law at a high level of generality," the CDC Officers are entitled to qualified immunity on the denial of medical treatment claim. *Vann*, 884 F.3d at 310. Thus, the Court grants summary judgment in favor of the CDC Officers on the denial of medical treatment claim.

### C.    Count Four—Monell

Kelson asserts a *Monell* claim under 42 U.S.C. § 1983 against the City asserting that the City policymakers and supervisors maintained unconstitutional customs, practices, and policies and additionally, that the City ratified such policies. To state a claim under § 1983, a plaintiff must allege: (1) "some person has deprived him of a federal right" guaranteed by the United States Constitution or federal law; and (2) "the person who deprived him of that right acted under color of state or territorial law." *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). The existence of a constitutional violation is a "threshold" requirement in any § 1983 claim. *Peterson v. City of Fort Worth*, 588 F.3d 838, 844 (5th Cir. 2009). "[W]ithout an underlying constitutional violation, there can be no § 1983 liability[.]" *Becerra v. Asher*, 105 F.3d 1042, 1047 (5th. Cir. 1997).

Kelson asserts theories of municipal liability, failure to train liability, and ratification of such unconstitutional policies against the City:

> Upon information and belief, Defendant City of Dallas Police Department, Fire Department, and City Marshal's Office, including its agents, employees, officers, and/or firefighter paramedics, together with other City of Dallas policymakers and supervisors maintained, inter alia, the following unconstitutional customs, practices, and/or policies:
> a. maintaining a policy of inaction and an attitude of indifference towards providing medical treatment for mentally ill persons ("MIPs") and homeless people in order to get them off the streets;
> b. maintaining a policy of unreasonably searching, seizing, and arresting MIPs and homeless people in order to get them off the streets;
> c. providing inadequate training regarding how to detain and treat MIPs and homeless persons;
> d. inadequately supervising, training, controlling, assigning, and disciplining City of Dallas Police Officers, Fire Department paramedics, City Marshal's

---

Office, and other personnel, including Defendants Clark, Cox, Morales, Todd, Morris, Bradfield, Hernandez, Warren, and Russell, who Defendant City of Dallas knew or in the exercise of reasonable care should have known were committing such egregious acts;

Defendant City of Dallas Police Department, Fire Department, and City Marshal's Office had actual and/or constructive knowledge of the deficient policies, practices and customs alleged above. Despite having knowledge of the above, the Defendant City of Dallas condoned, tolerated and through its own actions or inactions thereby ratified such policies. Such Defendant also acted with deliberate indifference to the foreseeable effects and consequences of these policies with respect to the constitutional rights of Fletcher.

(ECF No. 34 at 13-14). The Court will address each of these theories, beginning with municipal liability.

### 1.   *Municipal Liability*

To sustain municipal liability under § 1893, Kelson must point to more than the actions of a City of Dallas employee, he must identify a policymaker with final policymaking authority and a policy that is the moving force behind the alleged constitutional violation. "Municipal liability under 42 U.S.C. § 1983 requires proof of 1) a policymaker; 2) an official policy; 3) and a violation of constitutional rights whose "moving force" is the policy or custom." *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003) (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)). "To sustain liability under § 1983, the [Plaintiff] must point to more than the actions of an employee, [Plaintiff] must identify a policymaker with final policymaking authority and a policy that is the 'moving force' behind the alleged constitutional violation." *Rivera*, 349 F.3d at 247. The Supreme Court has explained that a governmental entity may not be held liable under § 1983 "unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell*, 436 U.S. at 691. "Municipalities are not liable on the theory of respondeat superior and are almost never liable for an isolated unconstitutional act on the part of an employee." *Hutcheson v. Dallas Cnty., Texas*, 994 F.3d 477, 482 (5th Cir. 2021).

---

(i)    Policymaker Prong

"The first requirement for imposing municipal liability is proof that an official policymaker with actual or constructive knowledge of the constitutional violation acted on behalf of the municipality." *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 167 (5th Cir. 2010). "The policymaker must have final policymaking authority." *Rivera*, 349 F.3d at 247. The identity of the policymaker is a question of state law. *Groden v. City of Dallas*, 826 F.3d 280, 284 (5th Cir. 2016). Kelson argues that the City of Dallas Police Department, Fire Department, and City Marshal's Office are the policymakers in this case. (ECF No. 34 at 13). However, under Texas law, "the final policymaker for the city of Dallas is the Dallas city council." *Groden*, 826 F.3d at 286 (citing Texas Local Gov't Code § 25.029). Thus, to show that the City of Dallas acted unconstitutionally, Kelson must show that the city council promulgated or ratified an unconstitutional policy. Kelson does not do this. In fact, Kelson does not point to a single specific custom or policy, much less one promulgated by the city council. Thus, Kelson fails to prove the first prong of municipal liability.

(ii)    Official Policy or Custom Prong

Upon consideration whether the "allegedly unconstitutional action constitutes a custom or policy of the municipality," two forms must be considered. *Zarnow*, 614 F.3d at 168. "First, a plaintiff may point to a policy statement formally announced by an official policymaker." *Zarnow*, 614 F.3d at 168. Alternatively, "the plaintiff may demonstrate a persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Zarnow*, 614 F.3d at 169. "The Supreme Court has explained that a custom may give rise to liability under *Monell* if the practice is so persistent and widespread as to practically have the force of law." *Moore v. LaSalle Mgmt. Co., L.L.C.*, 41 F.4th 493, 509 (5th Cir. 2022); *see Connick*

*v. Thompson*, 563 U.S. 51, 61 (2011) ("Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law.").

Kelson "may prove the existence of a custom or policy in one of two ways:" (1) a pattern of unconstitutional conduct on the part of municipal actors or employees; or (2) a final policymaker took a single unconstitutional action. *Zarnow*, 614 F.3d at 169. However, Kelson states that these arguments do not address the actual claims Kelson is making: "[f]irst, Plaintiffs are not claiming that an official written policy caused the violations of Fletcher's constitutional rights." (ECF No. 118 at 12). Second, Plaintiffs are not relying on a single incident to prove a policy of custom that cause the violation of Fletcher's constitutional rights." (ECF No. 118 at 12). Instead, Kelson cites multiple lawsuits filed in recent years against the City regarding incidents of arrest towards mentally ill and homeless people and indifference towards providing medical treatment, as well as other prior fatal incidents at the City's Detention Center (ECF No. 118 at 13). Kelson further argues that there is a third way to prove a valid municipal liability claim: "showing the need to take some action to control the government's agents is so obvious, and the inadequacy of existing practice so likely to result in violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to such need." (ECF No. 118 at 14). This third theory Kelson cites under which municipal liability can be found is known as failure to train liability.

(a) Failure to Train

The Supreme Court recognized that "there are limited circumstances in which an allegation of a failure to train can be the basis for liability under § 1983." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989).

> The inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate

> indifference to the rights of persons with whom the police come into contact . . . Only where a municipality's failure to train its employees in a relevant respect evidences a deliberate indifference to the rights of its inhabitants can such a shortcoming be properly thought of as a city policy or custom that is actionable under § 1983. If, in the light of the duties assigned to specific officers or employees the need for more or different training is so likely to result in the violation of constitutional rights, the policymakers of a city can reasonably be said to have been deliberately indifferent to the need, for which the city may be held liable if the failure to provide proper training, which may be viewed as a city policy, actually causes injury.

*Burge v. Par. of St. Tammany*, 187 F.3d 452, 472 (5th Cir. 1999).

"To establish *Monell* liability on a failure-to-train theory, a plaintiff must prove that: "(1) the city failed to train or supervise the officers involved; (2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and (3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights." *Henderson*, 51 F.4th at 130. "Because the standard for municipal liability is a stringent one, a pattern of similar constitutional violations by untrained employees is ordinarily required to show deliberate indifference." *Pena v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018). "In assessing whether a training policy and procedure is inadequate, we look to whether the program enables officers to respond properly to the usual and recurring situations with which they must deal." *Hicks-Fields v. Harris Cnty., Texas*, 860 F.3d 803, 811 (5th Cir. 2017). "Plaintiffs must demonstrate that the highly predictable consequence of not training is that the asserted injury would occur." *Hicks-Fields*, 860 F.3d at 811. "While it may in theory be possible to establish the inadequacy of a training program with a single incident, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable." *Hicks-Fields*, 860 F.3d at 811.

---

MEMORANDUM OPINION AND ORDER                                                    Page **31** of **35**

Kelson asserts that the City maintained policies "inadequately supervising, training, controlling, assigning, and disciplining" the Officers in the City's purview, while the City "knew or in the exercise of reasonable care should have known [the Officers] were committing such egregious acts." (ECF No. 34 at 13-14).  However, nowhere in Kelson's briefing does he reference any evidence concerning the procedures used to train the Officers, the Officers' qualifications, or direct references to the particular inadequacies of their training. *See Zarnow*, 614 F.3d at 170. Kelson has not plausibly alleged that the City failed to train the Officers involved on how to detain and treat MIPS and homeless persons. (ECF No. 118 at 15). For "liability to attach based on an inadequate training claim, a plaintiff must allege with specificity how a particular training program is defective." *Roberts v. City of Shreveport*, 397 F.2d 287, 293 (5th Cir. 2005). Because Kelson failed to allege how the City's training programs were defective, much less allege with specificity, the City cannot be liable under a failure to train theory of liability. (ECF No. 118 at 14-15). Thus, because Kelson cannot establish the first element of the failure to train test, the Court pretermits discussion of the other two elements.

Additionally, it must be noted that it appears to the Court that Kelson was confused as to his argument regarding failure-to-train liability. When Kelson argues that there is a third way to prove a valid municipal liability claim: by "showing the need to take some action to control the government's agents is so obvious, and the inadequacy of existing practice so likely to result in violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to such need," Kelson is effectively asserting a failure to train claim. (ECF No. 118 at 14). However, later in his briefing, Kelson explicitly states that he is asserting a failure to train claim. (ECF No. 118 at 15-16). In this latter argument, Kelson contends that his claim falls within the single-incident exception for deliberate indifference. (ECF No. 118 at 16-17). This

---

MEMORANDUM OPINION AND ORDER                                                    Page **32** of **35**

exception is very narrow—the "plaintiff must prove that the highly predictable consequence of a failure to train would result in the specific injury suffered." *Hutcheson*, 994 F.3d at 482. "For a violation to be highly predictable, the municipality must have failed to train its employees concerning a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face." *Hutcheson*, 994 F.3d at 482-83. "The single-incident exception is generally reserved for those cases in which the government actor was provided no training whatsoever." *Hutcheson*, 994 F.3d at 483; *see also Pena*, 879 F.3d at 624. Kelson does not argue that the City provided zero training to the Officers on how to detain and treats MIPs and homeless persons; rather he claims such training given was inadequate. (ECF No. 118 at 16-17). Kelson conclusory states that the City's training was inadequate without supporting evidence. Thus, Kelson's failure-to-train claim cannot fall under the single-incident exception.

Kelson's failure to train claim—whether explicitly stated as such or not—fails in all regards, and thus—as this is the only way in which Kelson attempts to prove the policy or custom prong of municipal liability—the City cannot be liable under the municipal liability theory of Kelson's *Monell* claim.

(iii)    Moving Force

Because the Court found both that the policymaker and policy or custom factors were not met to establish municipal liability, the Court pretermits further discussion of whether the City's actions were the moving force behind the alleged constitutional violations. This is further reinforced by the fact that the Court did not find any constitutional violations of the Fourth or Fourteenth Amendments as to the DPD or CDC Officers. *See supra* §§ III.A.1; III.B.1 (The Court concluded that both the DPD Officers and CDC Officers are entitled to qualified immunity on all claims.); *see Brown*, 243 F.3d at 192 (if a plaintiff "does not show any violation of his

constitutional rights—then there exists no liability to pass through to the City"). However, the DFR Paramedics are not parties to Defendants' Motion for Summary Judgment, so the Court cannot automatically dismiss the *Monell* claim against the City, but the lack of constitutional violations found above is an influential factor the Court can consider.

　　2.　*Ratification*

Kelson asserts that the DPD and CDC Officers had actual and/or constructive knowledge of the alleged deficient policies, practices, and customs, and that the City condoned, tolerated, and ratified such policies while having knowledge of such. (ECF No. 34 at 14). "An officer's decision is chargeable to the municipality if 'authorized policymakers approve [the] decision and the basis for it.'" *Cole v. Hunter*, 497 F. Supp. 3d 172, 186 (N.D. Tex. 2020) (citing *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127 (1988)). "The Fifth Circuit has explicitly held that a municipality is not liable under the ratification theory where a Police Chief accepts his officers' version of events, so long as 'that version did not show that the deputies' actions were manifestly indefensible.'" *Allen v. City of Galveston*, No. G-06-467, 2008 WL 905905, at *8 (S.D. Tex. March 31, 2008) (citing *Coon v. Ledbetter*, 780 F.2d 1158, 1162 (5th Cir. 1986)). "Without a showing that the Officers' actions were manifestly indefensible based on their version of the facts, failure to discipline, even if the City blindly accepted the Officers' version of the incident, does not equate to ratifying unconstitutional conduct." *Cole*, 497 F. Supp. 3d at 186; *see also Fraire v. City of Arlington*, 957 F.2d 1268, 1278 (5th Cir. 1992) ("Plaintiffs present nothing but conjecture when they allege that [the municipality] must have known [the officer] was lying.").

Kelson makes this ratification assertion in his Second Amended Complaint, yet completely fails to address any ratification theory in responding to Defendants' Motion for Summary Judgment. (ECF No. 34; ECF No. 118). Thus, Kelson has effectively abandoned his *Monell* claim under the ratification theory. *Hernandez v. City of Grand Prairie*, No. 3:16-cv-2432-L, 2017 WL

---

4098596, at *13 (N.D. Tex. Sept. 15, 2017) ("When a plaintiff fails to defend or pursue a claim in response to a motion or dismiss or summary judgment, the claim is deemed abandoned."); *see also Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1164 (5th Cir. 1983). Accordingly, the Court pretermits further discussion of the abandoned *Monell* claim under the ratification theory.

In sum, Kelson fails to prove *Monell* liability against the City under municipal liability—including failure to train liability—or under a ratification theory. Thus, the City is entitled to summary judgment on Kelson's *Monell* claim.

## IV.  CONCLUSION

For the reasons discussed above, Defendants' Motion for Summary Judgment, (ECF No. 111) is **GRANTED**. All of Plaintiff Kelson's claims against Individual Defendants James Hernandez, George Morales, Nicholas Morris, Christopher Todd, and DSO Warren are **DISMISSED WITH PREJUDICE**. All of Plaintiff Kelson's claims against Defendant City of Dallas are also **DISMISSED WITH PREJUDICE**.

**SO ORDERED:** December 20, 2023.

Ada E. Brown
UNITED STATES DISTRICT JUDGE